**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**MAURICE MOORE, #185249,**

      **Plaintiff,**              **CIVIL ACTION NO. 12-14783**

**vs.**                       **DISTRICT JUDGE MATTHEW F. LEITMAN**

                              **MAGISTRATE JUDGE MONA K. MAJZOUB**

**CARMEN PALMER, et al.,**

      **Defendants.**

_____/

## REPORT AND RECOMMENDATION

Plaintiff Maurice Moore, a former prisoner incarcerated through in the Michigan Department of Corrections (MDOC), filed this action under 42 U.S.C. §§ 1983 against Defendants alleging that they violated his Eighth Amendment Right to be protected from violence at the hands of other prisoners, that their related conduct amounted to gross negligence, that they violated his First Amendment Right to be free from retaliation, and that they conspired to violate Plaintiff's Eight Amendment Rights by delaying a criminal investigation into the physical attacks against him.   (*See* docket no. 1.)   Plaintiff also alleges that Defendants' conduct amounts to intentional infliction of emotional distress.   (*Id.*)   Plaintiff's Complaint stems from his time at the Michigan Reformatory (RMI), the Marquette Branch Prison (MBP), the G. Robert Cotton Correctional Facility (JCF), and the Iona Correctional Facility (ICF), although some of the events referenced in Plaintiff's Complaint also took place at the Gus Harrison Correctional Facility (ARF), the Carson City Correctional Facility (DRF), the Ryan Correctional Facility (RRF), and the Kinross Correctional Facility (KCF).   (*See id.*)   Plaintiff's Complaint lists the following Defendants:

1

Carmen Palmer (Warden at RMI); Timothy Kipp (Deputy Warden at RMI); Anthony Stewart (Assistant Deputy Warden at RMI); Matthew McCaulley (Assistant Deputy Warden at RMI); [Unknown] Sutherland (Inspector at RMI); Robert Napel (Warden at MBP); James Alexander (Deputy Warden at MBP); Ken Niemosto (Assistant Deputy Warden at MBP); Shane Place (Assistant Deputy Warden at MBP); Lincoln Marshall (Inspector at MBP); Chad LaCount (Resident Unit Manager at MBP); Debra Scutt (Warden at JCF); Joe Barrett (Deputy Warden at JCF); John Prelesnik (Warden at ICF); Nanette Norwood (Deputy Warden at ICF); Erica Huss (Assistant Deputy Warden at ICF); Aaron Vroman (Administrative Assistant at ICF); Betty Goodson (Inspector at ICF); Daniel Heyns (Director of the MDOC); Richard McKeon (former Director of the MDOC); Dennis Straub (Deputy Director of Correctional Facilities Administration for the MDOC); Laura Heinritz (Classification Director for the MDOC); Brad Haney (Classification Director for the MDOC); James Armstrong (Manager of Prison Affairs for the MDOC); Kenneth MacEachern (Administrative Assistant for Prison Affairs for the MDOC); Richard Stapleton (Administrator for the Office of Legal Affairs for the MDOC); Chad Chaney (Grievance Coordinator for the MDOC); Ray Wolfe (Regional Prison Administrator for the MDOC); and 20 John Doe Defendants.[1]   (*Id.* at 3-6.)

Before this Court is Defendants' Motion for Summary Judgment.   (Docket no. 70.) Plaintiff filed a Response (docket no. 73), and Defendants filed a Reply (docket no. 81).   All pretrial matters have been referred to the undersigned for consideration.   (Docket no. 34.)   The undersigned has reviewed the pleadings, dispenses with a hearing pursuant to E.D. Mich. L.R. 7.1(f)(2), and issues this Report and Recommendation.

---

[1] Defendant Goodson and the 20 John Doe Defendants have been previously dismissed from this matter.   (Docket nos. 63 and 66.)

## I.      Recommendation

For the reasons discussed herein, the Court should grant in part and deny in part Defendants' Motion for Summary Judgment [70] as follows:

    a.   Defendants' Motion for Summary Judgment should be granted with regard to Defendants Scutt, Barrett, Vroman, Heyns, Heinritz, Haney, Armstrong, MacEachern, Stapleton, Chaney, and Wolfe; Plaintiff's claims against these individual Defendants should be dismissed in their entirety; and

    b.   Defendants' Motion for Summary Judgment should be denied with regard to Defendants Palmer, Kipp, Stewart, McCaulley, Sutherland, Napel, Alexander, Niemosto, Place, Marshall, LaCount, Prelesnik, Norwood, Huss, McKeon, and Straub. None of Plaintiff's claims against these Defendant should be dismissed at this time.

## II.     Report

### A.      Factual Background

On October 1, 1986, Plaintiff was sentenced to a 25- to 50-year term of imprisonment for second-degree murder.   In 1995, while Plaintiff was incarcerated at the Gus Harrison Correctional Facility (ARF) in Adrian, Michigan, a riot broke out among the prisoners.   Plaintiff overhead other inmates—members of the Latin Counts gang—planning to assault a Corrections Officer (Balmes), at which time he decided to warn her.   Plaintiff alleges that without his intervention, Officer Balmes would have been killed.   But because of his decision to help an officer, Plaintiff was "identified by inmates and the Latin Counts gang as a target to be attacked and killed." (Docket no. 1 at 8.)

In November of 1996, Plaintiff was transferred to the Ryan Correctional Facility (RRF),

3

where Plaintiff alleges that he requested protection from Assistant Deputy Warden Grimes. (Docket no. 73-2 at 20.)   His request was not granted, but in July of 1997, apparently in exchange for helping the prison stop an attempted escape, Plaintiff was transferred to the Macomb Correctional Facility (MRF).[2]   In November of 1997, Plaintiff was transferred to the G. Robert Cotton Correctional Facility (JCF), and in December of 1997, he was transferred to the Carson City Correctional Facility (DRF).   While there, Plaintiff was assaulted by another inmate.   (*Id.*) And between February of 1999 and February of 2000, while Plaintiff was incarcerated at the Kinross Correctional Facility (KCF), he was assaulted a second time.   (*Id.*)   Plaintiff contends that both of these assaults were retaliation from the Latin Counts, but as Defendant argues, Plaintiff does not know exactly who assaulted him, although he "heard rumor[s]."   (*See* docket no. 73-2 at 23.)

Plaintiff's time in prison from 2000 through 2010 was largely uneventful with regard to this case.   But in April 2010, while incarcerated at the Michigan Reformatory (RMI) in Ionia, Michigan, Plaintiff found out that another inmate (Martinez), whom Plaintiff alleges was "known as a member of the Latin Counts," was in possession of weapons.   (*Id.* at 9.)   Plaintiff informed RMI staff, and after the weapons were found, Martinez was taken to Administrative Segregation.

A few days later, another inmate and associate of Plaintiff's, Chris Jones, was stabbed in the back by a member of the Latin Counts, apparently under the erroneous belief that Jones was responsible for turning in Martinez.   In early May 2010, Jones was attacked a second time, and

---

[2] Plaintiff alleges that sometime around October of 2001, he helped prevent an attempted escape by reporting the inmate's escape plans to the warden.   (Docket no. 73-2 at 20-21; *see also*, docket no. 70-4 at 2 (Plaintiff's letter to Warden Smith.)   This escape plan does not appear to have been related to the Latin Counts.   Thus, it does not appear to be related to any alleged retaliation by the gang.   Therefore, its only relevance to this matter is Plaintiff's implied contention that his continuous "meritorious acts" entitled him to special consideration by the MDOC.

while he was recovering in protective segregation, he received a message to "tell [Plaintiff] that the Counts [are] going to get him."   (*Id.*)   Jones took this information to Defendants Kipp (Deputy Warden), McCaulley, and Stewart (Assistant Deputy Wardens), but they told him that he should only be worried about himself.   (*Id.*)

At or around the same time, the Latin Counts threatened another one of Plaintiff's associates, inmate Derrick Vaughn.   Vaughn met with Defendant Kipp to discuss the threats, at which time he informed Defendant Kipp that the Latin Counts were threatening to kill Plaintiff because he "was a snitch and that he got one of theirs locked up in seg[regation] for a shank and that he had saved [a correctional officer] in a riot."   (*Id.* at 10 (modification sin original).)   Vaughn added that he and Jones were also targets because of their association with Plaintiff.[3]   (*Id.*)

On May 17, 2010, another inmate, Arthur Johnson, wrote a letter to Defendant Palmer (Warden), informing her that Plaintiff was a target of the Latin Counts for disclosing Martinez's weapons to the administration and for his role in protecting Officer Balmes back in 1995.   Johnson also met with Defendants Kipp, McCaulley, Stewart, and Sutherland (Inspector), at which time he gave them the same information.   Plaintiff alleges that Defendant Kipp told Johnson that "this [wasn't] the first time" they had heard of the threats.   (*Id.*)

On June 12, 2010, Plaintiff was attacked by another prisoner, who slashed Plaintiff's face with a shank.   Plaintiff was taken to Sparrow Hospital where he received 23 sutures on the right side of his face.   Plaintiff alleges that although internal reports were filled out, the prison never contacted the Michigan State Police to report the attack; he claims that Defendant Kipp told him

---

[3] Plaintiff alleges that Vaughn was offered protective custody at this time, but Defendants did not offer the same protection to Plaintiff.

that the police were not called "because they will see that it is an inmate on inmate [attack] and it will go to prosecuting credibility." (*Id.* at 11 (modification in original).) Plaintiff's brother, an officer with the City of Flint Police Department, also contacted to prison to find out why the incident had not been reported to the State Police, which resulted in a scheduled meeting between Plaintiff's brother and Defendant Sutherland. (*Id.* at 11-12.)

On June 25, 2010, Plaintiff was transferred to the Marquette Branch Prison (MBP), in Marquette, Michigan. Plaintiff claims that Defendant Kipp told him that he was being transferred "because of the repeated requests by Plaintiff and his family members for an investigation on the attack against Plaintiff."[4] (*Id.* at 12.) Plaintiff alleges that when he arrived at MBP, the MDOC had not sent any medical instructions along with him, despite the lingering injuries from his attack earlier that month. He was, however, interviewed by the MBP Security Classification Committee, including Defendants Alexander (Deputy Warden), Place, and Niemosto (Assistant Deputy Wardens); Plaintiff told the committee that he was attacked by a member of the Latin Counts and that he needed protection. Plaintiff further alleges that the SSC felt that he did not need protection at MBP. (*Id.* at 12-13; docket no. 73-2 at 32-33.) Plaintiff's request was denied, and he was placed in the general population. (*Id.*)

On July 2, 2010, someone filed a complaint with the Michigan State Police regarding the June 12, 2010 attack on Plaintiff at RMI. On July 5, 2010, Plaintiff wrote to Defendant MacEachern at the MDOC requesting that the Internal Affairs office investigate the alleged cover-up of the June 12, 2010 attack. Plaintiff's brother also contacted Defendant MacEachern

_____

[4] Plaintiff alleges that while he was at RMI, he spoke with Defendant Kipp four times to request transfers based on his need for protection. He also claims that he wrote a letter to Defendant Palmer requesting the same. (Docket no. 73-2 at 31-32.)

on July 9, 2010.  And on July 12, 2010, Plaintiff was interviewed by the State Police, at which time he gave a full account of the June 12, 2010 attack.  (Docket no. 1 at 13-14.)

Near the end of July 2010, Derrick Vaughn (the inmate that reported threats against Plaintiff to Defendant Kipp at RMI in May 2010 and witnessed the June 12, 2010 attack) was transferred to MBP.  When he arrived, MBP staff placed him in protective segregation.  But when Plaintiff requested the same protection, his request was denied.  Plaintiff alleges that Defendants initially told him that he was being denied protection because he was set to see the parole board in two weeks, and after he was granted a special program parole, he was denied protection because he was "going home."  (*Id.* at 14; docket no. 73-2 at 33.)   Plaintiff then wrote letters to Patricia Caruso, Deputy Director of the MDOC, and Jerri Sherry, Regional Administrator, requesting transfer into protective custody.   In response, Plaintiff was contacted by Defendant Napel (Warden), who told Plaintiff that he was responding to the letters directed to Caruso and Sherry and that he would not transfer Plaintiff.   (Docket no. 72-3 at 33.)

Plaintiff also alleges that he met with Defendant Napel "and his deputies" on or about December 14, 2010, where he "yet again expressed concern for his safety."   (Docket no. 1 at 14.) But in January 2011, Plaintiff received his grant of parole through the special parole preparation program.  (*Id.* at 14-15.)   Plaintiff also learned, however, that MBP did not have this program available, so he was going to be transferred to another prison.   Plaintiff spoke with Defendants Napal, Alexander, Niemosto, Place, Marshall (MBP Inspector) and LaCount (Plaintiff's Resident Unit Manager) regarding facilitation of his transfer because he "began to hear rumors that the Latin Counts had discovered [his] identity and presence at MBP."   (*Id.* at 15; docket no. 73-2 at 33.)

Plaintiff's request for protective custody or transfer was denied, and on March 3, 2011,

within a day or two of speaking with Defendants Marshall and LaCount, Plaintiff was attacked in the dining hall by another inmate.  (*Id.*)  According to Plaintiff, his attacker was placed in protective custody, but Plaintiff was not.  (Docket no. 1 at 15.)  Over the next several weeks, Plaintiff spoke with a member of MBP's Security Threat Group, his sister called Defendants LaCount and Haney (MDOC Classification Director) regarding Plaintiff's safety, and Plaintiff wrote letters to Defendants McKeon and Straub regarding the MBP administrator's failure to protect him.  (*Id.* at 15-16.)

On April 1, 2011, another Correctional Officer, O'Dell, told Plaintiff that he heard a rumor that the Latin Counts "are going to get you."  (*Id.* at 16.)  On April 3, 2011, the inmate who had attacked Plaintiff on March 3, 2011, was released from segregation and placed in the same yard group as Plaintiff.   On April 24, 2011, Plaintiff was attacked in the yard; he was stabbed in the eye with a pencil and beaten until he was unconscious.  (*Id.*)  Plaintiff was taken to the MBP health center and transferred to the University of Michigan Hospital for treatment.  (*Id.* at 17.)

On April 27, 2011, Plaintiff was released from the hospital and sent to the Cotton Correctional Institution (JCF) in Jackson, Michigan, where he was to continue his treatment. When he arrived, he was placed in the general population.  The next day, while Plaintiff was waiting for transfer from the general population to the JCF medical center, he was attacked by a group of at least five inmates.  He was stabbed in the back and neck and was punched in his injured eye while the attackers said "Latin Counts forever."  (*Id.*)  Plaintiff later learned that the inmate who had attacked him at RMI on June 12, 2010, was housed only six cells away from him at JCF; Plaintiff believes that this same individual is also the prisoner that stabbed him in the back and neck.  Plaintiff was sent back to the University of Michigan Hospital for treatment.  (*Id.* at

8

18.)

On May 12, 2011, Plaintiff was transferred to the Ionia Correctional Facility (ICF) in Ionia, Michigan.   Plaintiff learned that his attacker was also transferred to ICF, at which time Plaintiff requested protection from the ICF administration, including Defendants Presilnik, Norwood, and Huss.   (*Id.* at 19; docket no. 73-2 at 33-34.)   Plaintiff was then placed into administrative segregation, where he stayed until he was released eight months later, in January 2012.   (Docket no. 1 at 19.)   Plaintiff alleges that he wrote to Defendant Heyns regarding why he was placed in administrative segregation instead of protective segregation and why his attacker was being housed in the same facility.   (Docket no. 73-2 at 34.)

### B.   Governing Law

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   A moving party may meet that burden "by 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).   Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
>> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>>
>> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).   The Rule also provides the consequences of failing to properly support

or address a fact:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
>> (1) give an opportunity to properly support or address the fact;
>>
>> (2) consider the fact undisputed for purposes of the motion;
>>
>> (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or
>>
>> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).   "The court need consider only the cited materials, but it may consider other materials in the record."   Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."   *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).   Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike County Bd. Of Education*, 286 F.3d 366, 370 (6th Cir. 2002).

## C.    Analysis

Through their Motion for Summary Judgment, Defendants argue that (1) Defendants are immune from tort liability under MCL 691.1407 because they were governmental employees acting within the scope of their employment, discharging a governmental function, and their conduct did not amount to gross negligence; (2) Plaintiff cannot support his First Amendment retaliation claims because he cannot show that he was engaged in any sort of protected conduct, and there was no adverse action taken against him; (3) Plaintiff's claims against any of the

Defendants in their supervisory roles fail because Section 1983 liability cannot be premised on a theory of respondeat superior; (4) Plaintiff's claims fail because he has not shown personal involvement by all 27 Defendants; (5) Plaintiff's claims are barred by the applicable statute of limitations; and (6) Defendants are entitled to qualified immunity.   (Docket no. 70.)

## 1.        Statute of Limitations

As a threshold matter, Defendants argue that Plaintiff's claims are barred by the applicable statute of limitations.   (*Id.* at 21-23.)   Federal courts apply state personal injury statutes of limitation to claims brought under § 1983.   *Wilson v. Garcia*, 471 U.S. 261 (1985); *Harris v. United States*, 422 F.3d 322, 331 (6th Cir. 2005).   For civil rights suits filed in Michigan, the statute of limitations is three years.   Mich. Comp. Laws § 600.5805(8); *Carroll v. Wilkerson*, 782 F.2d 44, 44-45 (6th Cir. 1986).   And although statutes of limitation are governed by state law, the question of when civil rights claims accrue under Section 1983 remains one of federal law. *Wallace v. Kato*, 549 U.S. 384, 388 (2007) ("While we have never stated so expressly, the accrual date of a § 1983 cause of action is a question of federal law that is not resolved by reference to state law."); *LRL Properties v. Portage Metro Hous. Auth.*, 55 F.3d 1097, 1107 (6th Cir. 1995).   A cause of action accrues when the plaintiff knows or has reason to know of the injury that is the basis of the action.   *Friedman v. Estate of Presser*, 929 F.2d 1151, 1159 (6th Cir.1991).

Here, Defendants argue that "[a]ccording to Plaintiff, [his] injury arose in August 1995 when he assisted Balmes during a riot.   Therefore, the only 'attack' that would fall within the three year Statute of Limitations would be the attack that took place in either November or December of 1997."   (Docket no. 70 at 23.)   Defendants' argument misapplies the applicable law and misinterprets Plaintiff's claims.

11

As an initial matter, statutes of limitations bar the filing of a claim against a defendant when the plaintiff fails to file his Complaint during the applicable timeframe; there is no requirement that the alleged physical injury take place within a specific amount of time following a precipitating event.   Thus, even if Plaintiff's "injury arose in August 1995 when he assisted Balmes," it would be irrelevant when the additional "attacks" took place.

Nevertheless, Plaintiff's claims, as alleged, did not arise or accrue in 1995.   A reading of Plaintiff's Complaint in its totality indicates that Plaintiff's claims arise out of the attacks that occurred in 2010 and 2011, beginning at or about the time of his transfer to RMI.   Indeed, it would twist statute-of-limitations law beyond the bounds of logic to argue that Plaintiff's claims against individual Defendants at RMI, MBP, JCF, and ICF accrued before he was transferred to those prisons and before he had any interaction with any of those individuals whatsoever.   Moreover, Plaintiff does not assert any claims against any MDOC employees or any other individuals directly related to the 1995 riot, his assistance of Officer Balmes, or either of the attacks against him in the 1990s.   Instead, Plaintiff refers to these facts as background material for the events taking place in 2010, when Plaintiff alleges that he again became a target of the Latin Counts for his assistance in uncovering the weapons ring run by Martinez.   Therefore, even assuming, *arguendo*, that Plaintiff had reason to know of his alleged injuries the moment he provided information regarding the weapons ring without being placed in protective custody, his claims did not accrue until approximately April of 2010.   Plaintiff filed is Complaint in October of 2012, only two-and-a-half years later.   Defendants' statute-of-limitations argument fails.

## 2.      Personal Involvement and Supervisory Liability

Defendants also assert, through two separate arguments, that Plaintiff cannot support his

12

claims under Section 1983 because (1) Plaintiff has failed to show that all 27 Defendants were personally involved in the alleged unconstitutional conduct, and (2) in a related manner, for those Defendants in supervisory roles, a Section 1983 claim cannot be premised on a theory of respondeat superior.  (Docket no. 70 at 18-21.)  Defendants make these arguments generally with the implication that Plaintiff's claims should be analyzed through an all-or-nothing lens.   But to properly consider Plaintiff's claims in light of Defendants' contentions, the Court must consider the Defendants in the context of their relationships with Plaintiff.

As a matter of law, it is a well-established principle that § 1983 liability cannot be based on a mere failure to act or on a theory of respondeat superior.  *Salehpour v. Univ. of Tenn.*, 159 F.3d 199, 206-07 (6th Cir. 1998).  Rather, a supervisor must have "'either encouraged the specific incident of misconduct or in some other way directly participated in it.   At a minimum a plaintiff must allege that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.'"  *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Hays v. Jefferson Cnty.*, Ky., 668 F.2d 869, 874 (6th Cir.  1982)).  Thus, to support a claim under Section 1983, a plaintiff must show that each defendant, whether in a supervisory capacity or as an actor, was personally involved in, or otherwise condoned, encouraged, or knowingly acquiesced in the alleged misconduct.  *Id.*

### a.   Defendants Palmer, Kipp, Stewart, McCaulley, and Sutherland (the RMI Defendants)

In April or May of 2010, while housed at RMI, Plaintiff provided information to the prison administration regarding a weapons ring run by a member of the Latin Counts.  (*See* docket no. 70-12 at 2-3.)  But Defendants do not challenge his assertion.  Instead, Defendants argue that Plaintiff cannot show that Defendants committed any individual acts leading to Plaintiff's injury.

13

But Plaintiff claims that after the weapons were found, Chris Jones, one of Plaintiff's associates, was stabbed in his back by the Latin Counts, and a few weeks later, Jones was attacked again, at which time his attackers told him that they were going to "get" Plaintiff.   (Docket no. 1 at 9.) Plaintiff claims that he then spoke with Defendants Kipp, Palmer, and McCaulley to ask for protection, but his request was denied.   (Docket no. 73-2 at 31-32.)   And he alleges that two other inmates, Jones and Derrick Vaughn, spoke with Defendants Kipp, McCaulley, and Stewart to inform them that all three men were in danger of being assaulted by the Latin Counts.   (Docket no. 1 at 9-10.)   Plaintiff then alleges that another inmate, Arthur Johnson, wrote a letter to Defendant Palmer and met with Defendants Kipp, McCaulley, Sutherland, and Stewart to inform them that he heard rumors of Plaintiff being a target of the Latin Counts.   And according to Plaintiff, Defendant Kipp said that they had heard the claim before.   (*Id.* at 10.)

Plaintiff's claims are based on the premise that Defendants failed to act in light of a known danger to Plaintiff's safety.   It is well established that Defendants cannot defeat Plaintiff's claims by merely arguing that a "failure to act" is not cognizable under Section 1983.   Indeed, the duty to protect a prisoner from harm would have no meaning if the prison official could fail to protect him and evade liability by simply arguing that he failed to act.   *Cf. Allen v. Caruso*, 2009 WL 3063315, *4 (E.D. Mich. 2009) (quoting *Spencer v. Bouchard*, 449 F.3d 721, 730-31 (6th Cir. 2006) (internal quotations omitted))) ("[T]he rule [barring liability for failure to act] does not apply to cases challenging ongoing conditions of confinement'" because "'[t]he State's obligation to 'provide' these basic needs would have no meaning if a prison official could fail to provide them and then evade liability simply by pleading that he "failed to act.""").

Although Plaintiff's claims related to these Defendants are based almost entirely on his

14

own allegations and deposition testimony, Defendants have provided no evidence to suggest that these conversations did not take place.   Defendants do point to a letter from Plaintiff to Defendant Palmer on May 13 2010, in which he states, "At this point I don't feel like my life is in any imminent danger," to support the proposition that Plaintiff did not fear for his safety.   (Docket no. 70 at 14.)   But in the same letter, Plaintiff noted that he has "been labeled as a snitch, a 'cop saver,' and every other derogatory insulting name imaginable" and that there are "talks of [him] 'supposedly' being the individual responsible for foiling a weapons-making ring . . . at the facility."  (Docket no. 70-12 at 2.)   Thus, while this letter raises some doubt as to Plaintiff's credibility, viewing the available evidence in a light most favorable to Plaintiff, the undersigned finds that Plaintiff has produced enough evidence to raise a question of fact with regard to whether he asked Defendants Palmer, Kipp, Stewart, McCaulley, and Sutherland for protective custody, whether they knew of the danger facing Plaintiff before he was attacked on June 12, 2010, and whether they failed to offer him any protection.   Therefore, Defendants' argument fails with regard to the RMI Defendants.

> **b.** **Defendants Napel, Alexander, Niemosto, Place, Marshall, and LaCount (the MBP Defendants)**

Plaintiff claims that when he arrived at MBP, he was still suffering from his injuries related to the June 12, 2010 attack.   Sometime shortly after he arrived, he met with members of the MBP Security Classification Committee, including Defendants Alexander, Place, and Niemosto, at which time he informed them of the ongoing threats by the Latin Counts.   (*See* docket no. 73-2 at 32-33.)   Plaintiff claims that he asked for protection, but Defendants said, "Well, we don't believe that you going to need no protection, and so we're going to put you in population."  (*Id.* at 33.) Plaintiff further alleges that he spoke with Defendant Napel "at least four times" to ask him for

15

protection because inmates from RMI were being routinely transferred to MBP, including 15 to 20 members of the Latin Counts. (*Id.* at 32.) And in late July 2010, Derrick Vaughn was also transferred from RMI to MBP, at which time he was offered protective segregation. Plaintiff alleges that he approached Defendant Alexander to request the same protection, but his request was denied. (Docket no. 1 at 14.) And finally, Plaintiff alleges that he spoke with Defendant Marshal, who told Plaintiff that he would "talk to one of [his] STG coordinators" about a transfer, and he spoke with Defendant LaCount, who told Plaintiff that he was "just the low man on the totem pole," but he would "see what [he could] do" to get Plaintiff's transferred. (Docket no. 73-2 at 33.) Plaintiff was attacked in the dining hall within a few days of these conversations. (*Id.*)

As discussed with regard to the RMI Defendants, the undersigned acknowledges that Plaintiff's allegations are based on his own testimony and recollection of events. But Defendants have provided no evidence to suggest that these conversations did not take place or that Plaintiff did not request protection. Even Plaintiff's letter to Defendant Palmer fails to provide weight to the MPB Defendants' argument because there is no reason to believe they read Plaintiff's letter, and because the letter was written before Plaintiff was attacked at RMI.

More importantly, though, after Plaintiff was attacked in the dining hall on March 3, 2011, Defendants placed Plaintiff's attacker in protective segregation but provided no protection for Plaintiff. Plaintiff's sister called and spoke with Defendant LaCount (and Defendant Haney as discussed below) to express her fear for Plaintiff's safety. And on April 3, Plaintiff's attacker was released from segregation and placed back in the general population with Plaintiff. Three weeks later, Plaintiff was stabbed in the eye with a pencil and beaten unconscious. (Docket no. 1 at 16.)

16

Defendants would have the Court believe that these attacks are unrelated, that they were unaware of any potential threat to Plaintiff, and that Plaintiff either did not request or turned down offers of protective segregation. But accepting Defendants' position would require the Court to view the evidence in a light most favorable to Defendants. And because the Court must draw all justifiable inferences in Plaintiff's favor when determining the instant Motion, a question of fact remains with regard to whether each of the MBP Defendants was aware of Plaintiff's requests for protection, whether he made such a request to each of the MBP Defendants, and whether the MBP Defendants ignored his requests. Therefore, Defendants' argument fails with regard to the MBP Defendants.

### c. Defendants Scutt and Barrett (the JCF Defendants)

After being transferred from MBP to the University of Michigan Hospital for his eye injury, Plaintiff was sent to JCF. Plaintiff was placed in the general population at JCF for approximately one day while he waited to be transferred to the JCF Medical Center; he was attacked again during that one-day period, allegedly by the same inmate who had attacked him one year earlier at RMI. (Docket no. 1 at 17-18.) Plaintiff alleges that the inmate was housed only six cells away from his own. (*Id.* at 18.)

Unlike his claims with regard to the RMI and MBP Defendants, Plaintiff provides no evidence (even in the form of his own testimony or through allegations in his Complaint) to suggest that Defendants Scutt and Barrett had any interaction with Plaintiff whatsoever or that they had any knowledge of the prior interaction between Plaintiff and his alleged attacker. Plaintiff makes a vague allegation that the Defendants "were indisputably made aware of the Plaintiff's circumstances and safety needs" along with his record of "meritorious acts" and the "resulting

17

attacks."   (*Id.*)   But Plaintiff's claims are based on the "information and belief" that the prison warden and deputy warden review all prisoner files upon transfer.   (*Id.* at 17 n.8.)

Additionally, while not entirely clear from his Complaint, Plaintiff appears to assert that the JCF Defendants violated his First Amendment Right by failing to properly process his grievances.   (*See* docket no. 1. ¶¶ 104, 107, and 139.)   Again, though, other than his general comment that Defendant Scutt asked Plaintiff to sign off on his grievances and that Plaintiff refused to do so, Plaintiff provides no evidence to even suggest that the JCF Defendants failed to properly process his grievances.   More specifically, he fails to provide any evidence that they were directly involved in the grievance process or that they implicitly authorized, approved, or knowingly acquiesced in failing to process the grievances.

While Plaintiff may have requested and needed protection on his arrival at JCF, Defendants have shown that Plaintiff cannot produce admissible evidence to support his allegations that Defendants Scutt and Barrett had any knowledge of this need or of any request that he may have made.   And to the extent Plaintiff's claims against the JCF Defendants relate only to his Count III claims for violations of the First Amendment, Plaintiff is unable to pruduce any admissible evidence to show that the JCF Defendants were personally involved in the alleged unconstitutional conduct.   Plaintiff's conclusory allegations do no more than raise some metaphysical doubt with regard to his claims.   Therefore, the Court should grant Defendants' Motion with regard to Defendants Scutt and Barrett and dismiss them from this matter.

### d.   Defendants Prelesnik, Norwood, Huss, and Vroman (the ICF Defendants)

Plaintiff's claims against the ICF Defendants are substantially different than his claims against the RMI, MBP, and JCF Defendants because, notably, Plaintiff was not attacked while

18

incarcerated at ICF.   Thus, his Eighth Amendment claims for failure to protect do not apply to the ICF Defendants.   Instead, Plaintiff claims that the ICF Defendants violated the First Amendment when they placed him in administrative segregation from the time of his arrival at ICF in May 2011 through his release in January 2012.   (Docket no. 1 at 24.)   Plaintiff asserts that the ICF Defendants placed him in administrative segregation instead of protective segregation in retaliation for

> Plaintiff's repeated written and oral requests—made personally, and by members of his family (particularly, his brother, Officer Ralph Carouthers) on his behalf—for follow-up investigation into why Plaintiff had been continually housed in general population, with members of a gang known to seek Plaintiff's death or great bodily harm on Plaintiff by other inmates.

(*Id.*)   Plaintiff alleges that when he arrived at ICF, he met with Defendants Preselnik, Norwood, and Huss, and Plaintiff asked why he was being placed in administrative segregation instead of protective segregation.   Plaintiff alleges that Defendants told him it was for his own protection. (Docket no. 73-2 at 34.)

The undersigned finds that Plaintiff has provided sufficient evidence to show that Defendants Preselnik, Huss, and Norwood were personally involved in the alleged unconstitutional conduct.   Whether or not the conduct itself was unconstitutional is a matter not raised by Defendants in their Motion.   With regard to Defendant Vroman, however, Plaintiff has provided no evidence and no allegations to suggest how Defendant Vroman is involved in any of Plaintiff's claims.   Therefore, the Court should grant Defendants' Motion with regard to Defendant Vroman and dismiss him from this matter.

> **e.      Defendants Heyns, McKeon, Straub, Heinritz, Haney, Armstrong, MacEachern, Stapleton, Chaney, and Wolfe (the MDOC Administration Defendants)**

With regard to the MDOC Administration Defendants, Plaintiff claims that he contacted some of them with regard to his requests for protection, but in general, he claims that these individuals conspired to delay any criminal investigation into the attacks against him. (*See* docket no. 1 at 25-26.)

### i.       Defendant Heyns

Plaintiff does not mention Defendant Heyns in his Complaint, but in his deposition testimony, Plaintiff states that he wrote a letter to Defendant Heyns in his role as Acting Director of the MDOC. (Docket no. 73-2 at 34.) Plaintiff has not provided a copy of this letter, and he provides no insight with regard to what the letter contained. Plaintiff has provided no evidence to suggest that Defendant Heyns was personally involved in any of the incidents related to Plaintiff's claims or that he implicitly authorized, approved, or knowingly acquiesced in any of the alleged conduct (or lack of conduct) by his subordinates. Therefore Plaintiff's claims against Defendant Heyns should be dismissed.

### ii.      Defendants McKeon and Straub

Plaintiff's only communication with Defendants McKeon and Straub (Director and Deputy Director of the MDOC) appears to have been through a letter written by Plaintiff on March 23, 2011—after Plaintiff was attacked in the dining hall at MBP but before he was stabbed in the eye and transferred to JCF. (*See* docket no. 73-8 at 2.) In the letter, Plaintiff informs Defendants that he fears for his safety, that he has feared for his safety for some time, that he was attacked at RMI, that he was attacked against at MBP, and that he needs to be "at one of the protective custody facilities or [placed] into [the] tether program." (*Id.*) Thus, as discussed above with regard to the RMI and MBP Defendants, Plaintiff has shown that there is a question of fact with regard to

20

whether Defendants McKeon and Straub were personally involved in the alleged unconstitutional conduct.   Therefore, Defendants' argument fails.

### iii.   Defendants Hienritz and Haney

Plaintiff did not have any direct contact with Defendant Hienritz (Classification Director for the MDOC) and Defendant Haney (Defendant Hienritz's Administrative Assistant).   Instead, Plaintiff's family contacted Defendants to see if they could help have Plaintiff transferred into protective custody.   Plaintiff has provided no evidence to suggest what information was provided to Defendant Hienritz during the alleged conversation, what her responses were to Plaintiff's family's request, or what action Defendant Hienritz took following the conversation.   Plaintiff claims that Defendant Haney told Plaintiff's sister that he would "check into getting [Plaintiff] transferred."   (Docket no. 73-2 at 35.)   In light of Defendants' argument, Plaintiff has done nothing more than raise some speculation as to Defendant Hienritz and Haney's personal involvement in this matter.   Therefore, Plaintiff's claims against Defendant Hienritz and Haney should be dismissed.

### iv.   Defendants Armstrong and MacEachern

Plaintiff claims that he wrote to Defendant Armstrong to ask that Defendant investigate his assault, why his grievances were not being processed, and about his placement.   (Docket no. 73-2 at 35.)   And he alleges that he and his brother each contacted Defendant MacEachern between July 5, 2010, and July 9, 2010, to ask why the Internal Affairs Office had failed to investigate the MDOC's alleged cover-up of the June 2, 2010 attack.   (Docket no 1 at 13.)   Nevertheless, the MSP began its investigation of the attack "[d]uring the week of July 2-9, 2010."   (Docket no. 1 at 13.)   Thus, as discussed below, Plaintiff has failed to provide any evidence to suggest that

21

Defendants Armstrong or MacEachern were personally involved in any alleged unconstitutional conduct.   Plaintiff's claims against Defendants Armstrong and MacEachern should be dismissed.

### v.      Defendant Stapleton

Plaintiff's only interaction with Defendant Stapleton (an Administrator with the MDOC Office of Legal Affairs) was with regard to a letter sent to Defendant Stapleton by Plaintiff. Plaintiff asked Defendant Stapleton why his grievances were not being processed.   (Docket no. 73-2 at 35.)   Plaintiff has provided no evidence to suggest that Defendant Stapleton was involved in the grievance process in any way or any evidence to suggest that Defendant Stapleton was personally involved in any alleged constitutional violation.   Therefore, Plaintiff's claims against Defendant Stapleton should be dismissed.

### vi.      Defendant Chaney

Plaintiff's only interaction with Defendant Chaney was with regard to a grievance filed by Plaintiff.   Plaintiff appears to have submitted the grievance to Defendant Chaney, who then told Plaintiff that the grievance had to be submitted directly to his Unit Supervisor or Unit Manager. (Docket no. 73-2 at 35.)   This tangential connection to Plaintiff's claims is insufficient to show that Defendant Chaney had any personal involvement in the alleged unconstitutional conduct. Therefore, Plaintiff's claims against Defendant Chaney should be dismissed.

### vii.      Defendant Wolfe

Plaintiff claims that he contacted Defendant Wolfe "so many times . . . asking him to put me in protection."   (Docket no. 73-2 at 34.)   Plaintiff alleges that all of his letters to Defendant Wolfe were sent "prior to the last three [assaults], but after the first two."   (*Id.* at 35.)   Like with Defendants Hienritz and Haney, Plaintiff's statement that he sent letters to Defendant Wolfe

sometime between 1997 and 2010 does not show that Defendant Wolfe had any personal involvement in the alleged unconstitutional conduct. Plaintiff's claims against Defendant Wolfe should be dismissed.

### 3. Plaintiff's First Amendment Claims

Prison officials may not retaliate against inmates who have engaged in constitutionally protected activities or conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir.1999). A retaliation claim has three elements: "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Id.* (citations omitted). "Once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant. . . . If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail." *Id.* at 399 (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)).

Defendants assert that "it is not clear what protected actions that Plaintiff is referencing," and they argue that "[t]here was no adverse action here; MDOC just refused to release Plaintiff from prison." (Docket no. 70 at 17.) But in his Count III, Plaintiff claims that Defendants' violated his First Amendment rights when the retaliated against him "in response to Plaintiff's repeated written and oral requests . . . for a follow-up investigation into why Plaintiff had been continually housed in general population, with members of a gang known to seek Plaintiff's death or great bodily harm." (Docket no. 1 at 24.) Plaintiff claims that Defendants "retaliatory

activities included the refusal to process Plaintiff's grievances; the refusal to honor Plaintiff's (or his family members') requests for the reports on Plaintiff's attacks; and transfers into general population at facilities known to have inmates who have made threats against Plaintiff" as well as "the placement of Plaintiff in administrative segregation from May 12, 2011 through January 18, 2012." (*Id.*)  Thus, contrary to Defendants' assertions, Plaintiff's claimed protected action is clear, as are Plaintiff's claims of retaliatory conduct.  And although Defendants do not address whether a causal connection exists, Plaintiff has provided enough circumstantial evidence with regard to a connection so as to raise a question of fact.  (*See* docket no. 73 at 26-28.)  Therefore, Defendants' Motion should be denied with regard to this issue.

### 4.      Gross Negligence and Eighth Amendment Violations

Plaintiff's primary claim is that Defendants violated his Eighth Amendment rights when they were subjectively and objectively aware of the danger to Plaintiff's health and safety by the Latin Counts and they disregarded that risk.  (Docket no. 1 at 20-22.)  Alternatively, Plaintiff claims that Defendants' inaction amounted to gross negligence when they failed to take reasonable measures to protect Plaintiff in light of the threats to his life.  (Docket no. 22-23.)  Although Defendants acknowledge that gross negligence "is normally an issue for the trier of fact to decide," they argue that Plaintiff's Eighth Amendment and gross-negligence claims should be dismissed because "Plaintiff's conclusory allegations . . . [are] without any factual basis."  (Docket no. 70 at 15 (citing *Vermilya v. Dunham*, 195 Mich. App. 79, 83 (1992)).)

In support of this contention, Defendants point to Plaintiff's regular activities, including attending his callouts, regularly attending yard time and meals, and participating on the Warden's Forum.  (*Id.* at 16.)  Moreover, Defendants assert, "[m]ost of the Defendants did not know

24

anything about Plaintiff or/his (sic) 'meritorious acts.'" (*Id.*)   At most, however, Defendants have raised a question of fact with regard to Plaintiff's claims.   Plaintiff claims that he feared for his safety and that he frequently requested protection.   He was attacked multiple times, and as discussed above, he has provided evidence supporting his requests for protection, both before and after these attacks.   Thus, while Defendants' argument is well-taken, they have not met their burden of showing an absence of evidence supporting Plaintiff's case.   And while Plaintiff and Defendants discuss Plaintiff's "meritorious acts," these acts have absolutely no bearing whatsoever—positive or negative—on Defendants' duty to protect Plaintiff or whether Defendants' conduct violated the Eight Amendment.   Therefore, Defendants' Motion should be denied with regard to this issue.

### 5.     Qualified Immunity

Under qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."   *Harlow v. Fitzgerald*, 457 U.S. 800, 817–818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "'The defense of qualified immunity protects officials from individual liability for monetary damages but not from declaratory or injunctive relief.'"   *Top Flight Entertainment, Ltd. v. Schuette*, 729 F.3d 623, 635 n.2 (6th Cir. 2013) (quoting *Flagner v. Wilkinson*, 241 F.3d 475, 483 (6th Cir. 2001)).

The Sixth Circuit has set forth a tri-part test to determine whether a defendant is entitled to qualified immunity: whether (1) "the facts viewed in the light most favorable to the plaintiff[] show that a constitutional violation has occurred;" (2) "the violation involved a clearly established

25

constitutional right of which a reasonable person would have known;" and (3) "the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 302 (6th Cir. 2005) (citing *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir.2003)); *see also Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir.1999) (en banc) (noting that "objective legal reasonableness" is a distinct, third prong of the qualified immunity analysis). The court may, however, take up these considerations in any order. *See Pearson v. Callahan*, 555 U.S. 223 (2009).

Defendants allege that they are entitled to qualified immunity for Plaintiff's claims. But Defendants do not develop their argument. Instead, they merely assert that they are entitled to qualified immunity and set forth the applicable law. (Docket no. 70 at 23-24.) As Plaintiff argues, his Eighth Amendment and First Amendment rights in matters such as this have been clearly established. And as discussed, Plaintiff has provided sufficient evidence to raise a question of fact with regard to whether Defendants violated those rights. The undersigned also finds that if Plaintiff did, in fact, ask for protection as he asserts, particularly after he was attacked at RMI and transferred to MBP, a question of fact also exists with regard to whether Defendants' conduct was objectively unreasonable. Therefore, Defendants' Motion should be denied.

## D.     Conclusion

For the reasons stated above, the undersigned recommends that Defendants' Motion for Summary Judgment [70] be granted in part and denied in part as follows:

a.     Defendants' Motion for Summary Judgment should be granted with regard to Defendants Scutt, Barrett, Vroman, Heyns, Heinritz, Haney, Armstrong, MacEachern,

Stapleton, Chaney, and Wolfe; Plaintiff's claims against these individual Defendants should be dismissed in their entirety; and

b.      Defendants' Motion for Summary Judgment should be denied with regard to Defendants Palmer, Kipp, Stewart, McCaulley, Sutherland, Napel, Alexander, Niemosto, Place, Marshall, LaCount, Prelesnik, Norwood, Huss, McKeon, and Straub.  None of Plaintiff's claims against these Defendants should be dismissed at this time.

## III.   Notice to Parties Regarding Objections

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).   Failure to file specific objections constitutes a waiver of any further right of appeal.   *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.   *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n Of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Any objections must be labeled as "Objection #1," "Objection #2," etc.   Any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains. Not later than fourteen days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity.   The response must

27

specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.

Dated:   July 21, 2015            s/ Mona K. Majzoub_____
                                  MONA K. MAJZOUB
                                  UNITED STATES MAGISTRATE JUDGE

**PROOF OF SERVICE**

I hereby certify that a copy of this Report and Recommendation was served on counsel of record on this date.

Dated:   July 21, 2015            s/ Lisa C. Bartlett
                                  Case Manager

28